IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| HARRY ONO; CRAIG INAGAKI; and STEPHEN LEONG, <br><br> Plaintiffs, <br><br> vs. <br><br> HAROLD DIAS, JR; LOCAL UNION 1186; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS; and INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, <br><br> Defendants. | CIVIL 14-00327 LEK-KSC |

**ORDER DENYING AS MOOT PLAINTIFFS' MOTION FOR
A PRELIMINARY INJUNCTION; AND GRANTING IN PART AND
DENYING IN PART DEFENDANTS INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS AND HAROLD DIAS, JR.'S MOTION
TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

Before the Court is Plaintiffs Harry Ono ("Ono"), Craig Inagaki ("Inagaki"), and Stephen Leong's ("Leong," collectively "Plaintiffs") Motion for a Preliminary Injunction ("Preliminary Injunction ("Preliminary Injunction Motion"), filed on July 21, 2014; and Defendants International Brotherhood of Electrical Workers ("IBEW") and Harold Dias, Jr.'s ("Dias") Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Motion to Dismiss"), filed on August 6, 2014.[1]  [Dkt. nos. 4,

_____

[1] On August 7, 2014, Defendant Local 1186, International Brotherhood of Electrical Workers ("Local 1186"), filed its joinder in the Motion to Dismiss.  [Dkt. no. 28.]  Local 1186 is a local union under the jurisdiction of IBEW, the international
(continued...)

16.]  Plaintiffs filed their memorandum in opposition to the Motion to Dismiss on August 28, 2014, and IBEW and Dias filed their reply on September 4, 2014.  [Dkt. nos. 33, 34.]  The Court finds this matter suitable for disposition without a hearing pursuant to Rule LR7.2(d) of the Local Rules of Practice of the United States District Court for the District of Hawai`i ("Local Rules").  After careful consideration of the Preliminary Injunction Motion and the Motion to Dismiss, supporting and opposing memoranda, and the relevant legal authority, the Preliminary Injunction Motion is HEREBY DENIED as moot; and IBEW and Dias's Motion to Dismiss is HEREBY GRANTED IN PART AND DENIED IN PART for the reasons set forth below.

**BACKGROUND**

On July 21, 2014, Plaintiffs, who are three recently elected Local 1186 officials, filed their Complaint and the Preliminary Injunction Motion, asserting jurisdiction pursuant to, *inter alia*, the Labor-Management Reporting and Disclosure Act of 1959 ("the LMRDA"), 29 U.S.C. § 412.  [Dkt. nos. 1 (Complaint) at ¶ 8, 4 (Preliminary Injunction Motion).]  The Complaint centers on IBEW's invalidation of a Local 1186 election held in June 2014, and the Preliminary Injunction Motion requested this Court enjoin the new election ordered by IBEW.

---

[1](...continued)
labor organization.  The Court will refer in this Order to IBEW, Local 1186, and Dias together as "Defendants."

The following facts are undisputed. On June 21, 2014, Local 1186 held an election ("the June Election") and Plaintiffs, along with other individuals who were part of the "Members for Change" campaign ("the Reform Slate") prevailed. [Preliminary Injunction Motion, Exh. 10 (results);[2] Mem. in Supp. of Motion to Dismiss at 3.] On June 23, 2014, Damien Kim ("Kim"), the defeated incumbent Business Manager-Financial Secretary,[3] protested the election to IBEW Vice President Michael Mowrey ("Mowrey"). [Motion to Dismiss, Decl. of Michael S. Mowrey ("Mowrey Decl.") at ¶¶ 6-7; id., Exh. 1 ("6/23/14 Kim Ltr. to Mowrey"); Mem. in Opp. to Motion to Dismiss at 8 (citing 6/23/14 Kim Ltr. to Mowrey).] On June 24, 2014, Mowrey assigned Dias to investigate the protest, [Mowrey Decl., Exh. 2 ("6/24/14 Mowrey Mem. to Dias"),] and after conducting the investigation, on July 1, 2014, Dias gave a report to Mowrey, recommending that he void the June Election [Motion to Dismiss, Decl. of Harold J. Dias ("Dias Decl.") at ¶ 7; id., Exh. 1 ("Dias Report") at pg.

---

[2] Plaintiffs' Exhibits 1-11 are attached to the Preliminary Injunction Motion, and incorporated by reference into their memorandum in opposition to the Motion to Dismiss. [Mem. in Opp. at 3.] Neither these exhibits nor Exhibits 12-15, attached to the memorandum in opposition, have been authenticated by an attorney.

[3] According to the IBEW Constitution, the "business manager shall be the principal officer of the [Local Union] . . . ." [Preliminary Injunction Motion, Exh. 2 at p. 52 (Art. XVI, § 2).]

315;[4] Mem. in Opp. to Motion to Dismiss at 10-13 (describing Dias Report)].

Based at least in part on the Dias Report, Mowrey decided to invalidate the June Election results ("the Mowrey Decision"). [Mowrey Decl. at ¶¶ 9-12.] On July 10, 2014, Mowrey sent a letter to incumbent Local 1186 president Peter Akamu ("Akamu") informing him that there had been a serious violation of the LMRDA based on "Employer Interference," and ordering him to hold a new election within thirty days. [Mowrey Decl., Exh. 3 ("7/10/14 Mowrey Ltr. to Akamu"); Preliminary Injunction Motion, Exh. 5 (same).] The "employer interference" related to purportedly impermissible involvement of business owner, Gerard Yuh ("Yuh") – who was also a former member and officer of Local 1186 – for campaigning for the Reform Slate. See Dias Report at pgs. 311-15. Shortly after the July 10, 2014 Mowrey Letter to Akamu, Plaintiff Inagaki sent a complaint to Mowrey and filed the Reform Slate's grievances with the Department of Labor ("DOL"). [Mowrey Decl., Exh. 4 ("DOL Complaint"); Complaint at ¶ 49.]

On July 21, 2014, Plaintiffs filed the Complaint and Preliminary Injunction Motion, arguing that the Mowrey Decision amounted to the creation and enforcement of an "ad hoc" rule that

---

[4] Many of Plaintiffs' and Defendants' exhibits do not have internal page numbers and thus the Court uses the notation "pg." to refer to the CM/ECF docket pages.

4

violated their right to free speech and assembly guaranteed by Title I of the LMRDA.  [Complaint at ¶¶ 51-70.]  The Court held status conferences on July 22 and July 30, 2014 [dkt. nos. 11, 13] and, on August 6, 2014, the parties filed a joint stipulation agreeing to impound the completed ballots from the new election ordered by IBEW ("July Election") [dkt. no. 19].

Also on August 6, 2014, IBEW and Dias filed the Motion to Dismiss, which argues that this Court does not have jurisdiction to hear the Complaint, and that the Preliminary Injunction Motion must fail.  [Dkt. no. 16.]  On August 7, 2014, the Court issued an entering order setting a briefing schedule, and limiting briefing to the jurisdictional issue.  [Dkt. no. 29.]  Since the July Election ballots have been impounded, the Court DENIES the Preliminary Injunction Motion as moot. Plaintiffs may renew the Preliminary Injunction Motion if there is any change in the status quo that would necessitate immediate relief.  Thus, the remainder of this Order focuses solely on the issue of whether this Court has jurisdiction over the Complaint.

## STANDARD

"A [Federal Rule of Civil Procedure] Rule 12(b)(1) jurisdictional attack may be facial or factual."  Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004) (citation omitted).  "A 'facial' attack asserts that a complaint's allegations are themselves insufficient to invoke jurisdiction,

5

while a 'factual' attack asserts that the complaint's allegations, though adequate on their face to invoke jurisdiction, are untrue." Courthouse News Serv. v. Planet, 750 F.3d 776, 793 n.3 (9th Cir. 2014) (citation omitted). "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cnty., 343 F.3d 1036, 1040 n.2 (9th Cir. 2003) (citation omitted).

"As a general rule, when '[t]he question of jurisdiction and the merits of [the] action are intertwined,' dismissal for lack of subject matter jurisdiction is improper." Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold & Easement in the Cloverly Subterranean, Geological Formation, 524 F.3d 1090, 1094 (9th Cir. 2008) (alterations in Williston Basin) (quoting Safe Air, 373 F.3d at 1039). This occurs when, as here, "a party's right to recovery rests upon the interpretation of a federal statute that provides both the basis for the court's subject matter jurisdiction and the plaintiff's claim for relief." Id. (citations omitted). Instead of reviewing the motion under Rule 12(b)(1), the court must examine whether there are genuine issues of material fact,

pursuant to Federal Rule of Civil Procedure 56, that could give rise to jurisdiction. See Safe Air, 373 F.3d at 1040. The court must view the evidence in the light most favorable to the nonmoving party to determine whether there are any genuine issues of material fact. See id. at 1040 n.4 (citation omitted); see also id. at 1048 (Paez, J., concurring) (explaining that the "ultimate task is to determine whether [the plaintiff] has presented evidence that, if accepted as true, creates a genuine issue" as to the factual basis for jurisdiction).

## **DISCUSSION**

Defendants offer evidence and argue that, while Plaintiffs allege in the Complaint that Defendants have violated their rights under Title I of the LMRDA, which protects freedom of speech and assembly, in substance, the Complaint alleges a violation of Title IV, relating to election rights and procedures. Thus, they argue, since the Secretary of Labor has exclusive jurisdiction over Title IV challenges, this Court lacks subject matter jurisdiction over the Complaint.

Plaintiffs respond that they do state a claim under Title I, and provide evidence to show that the Dias Report and Mowrey Decision rely on mistakes of law and fact that cause the claim to extend beyond Title IV and chill their Title I rights; therefore, this Court does have jurisdiction. Although this is a close question, the Court finds that, at this early stage of the

litigation, there are genuine issues of material fact as to the bases for the Dias Report and Mowrey Decision, and dismissal for lack of jurisdiction would be premature.

Title IV of the LMRDA, codified at 29 U.S.C. §§ 481-83, establishes standards for union elections. One provision limits contributions to union elections from union coffers and "employers." 29 U.S.C. § 481(g).[5] Pertinent to this case, it provides that, "no moneys of an employer shall be contributed or applied to promote the candidacy of any person in any election subject to the provisions of this subchapter." Id. An implementing regulation provides:

> (a) As an additional safeguard, section 401(g) provides that no money of an employer is to be contributed or applied to promote the candidacy of any person in an election subject to the provisions of title IV. **This includes indirect as well as direct expenditures.** Thus, for example, campaigning by union stewards on company time with the approval of the employer would violate section 401(g) unless it can be shown that they are on legitimate work assignments, and that their campaign activities are only incidental to the performance of their assigned task and do not interfere with its performance. **This prohibition against the use of employer money includes any costs incurred by an employer, or anything of value contributed by an employer, in order to support the candidacy of any individual in an election.** It would not, however, extend to ordinary business practices which result in conferring a benefit, such as, for example, a discount on the cost of printing campaign

---

[5] Courts and Congress also refer to this section as Section 401(g) based on its numbering in the LMRDA.

> literature which is made available on the same
> terms to other customers.
>
> (b) The prohibition against the use of employer
> money to support the candidacy of a person in any
> election subject to the provisions of title IV is
> not restricted to employers who employ members of
> the labor organization in which the election is
> being conducted, or who have any business or
> contractual relationship with the labor
> organization.

29 C.F.R. § 452.78 (emphasis added).

Title IV also "provides an elaborate postelection procedure aimed solely at protecting union democracy through free and democratic elections, with primary responsibility for enforcement lodged with the Secretary of Labor." Local No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen & Packers v. Crowley, 467 U.S. 526, 528 (1984). To that end, a member claiming a Title IV violation must first exhaust his internal local and international union remedies, and then may file a complaint with the Secretary of Labor. 29 U.S.C. § 482(a). The LMRDA provides that the "remedy provided by [Title IV] for challenging an election already conducted shall be exclusive." 29 U.S.C. § 483.

Defendants argue that Plaintiffs' challenge to the June Election falls squarely within the ambit of Title IV since Mowrey voided the election based on findings of violations of § 481(g). Mowrey attests that, in the Dias Report, Dias "concluded that that [sic] Gerald Yuh, an employer, had campaigned for

9

Craig Inagaki, Harry Ono and the 'Members for Change' slate, by mailing out campaign fliers, distributing campaign literature and speaking to union members individually and in groups." [Mowrey Decl. at ¶ 9.] Mowrey states that, based on his review of the Dias Report and his understanding of § 481(g), he "concluded that a serious violation of the LMRDA had occurred that had undermined the integrity of Local 1186's election." Id. at ¶ 11; see also 7/10/14 Mowrey Ltr. to Akamu ("After a very thorough investigation I have determined that there was a serious violation of the LMRDA by 'Employer Interference' in the election process of Local Union 1186. As a result of my determination I instruct Local Union 1186 to void the election results of June 21, 2014 . . . ."). Defendants argue that Plaintiffs should take up their disagreement with Mowrey's interpretation of § 481(g) with the Secretary of Labor, who has exclusive jurisdiction of disputes over election procedures.

Plaintiffs, however, argue that their claims extend beyond the purview of Title IV, into Title I, codified at 29 U.S.C. §§ 411-14, and are not preempted. Among the rights afforded in Title I, § 411(a)(2) protects union members' freedom of assembly and speech:

> Every member of any labor organization shall have **the right to meet and assemble freely with other members; and to express any views, arguments, or opinions**; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any

10

> business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided*, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(2) (bold emphasis added). Unlike purported Title IV violations, a union member may challenge a violation of Title I in federal district court, rather than before the Secretary of Labor. 29 U.S.C. § 412. Further, as the Ninth Circuit Court of Appeals has held, Title IV does not entirely preempt Title I challenges to election-related practices:

> Total preemption of Title I relief by Title IV in the area of elections is belied by the legislative history of the LMRDA. Title IV had been drafted, discussed, and approved before Title I was even proposed. Congress added Title I at least partly in response to fears that Title IV was not strong enough to effectuate the central purpose of the LMRDA, the preservation of union democracy.

Kupau v. Yamamoto, 622 F.2d 449, 455 (9th Cir. 1980) (citation omitted). It explained that the "crucial inquiry is whether a union member has been discriminated against in the exercise of his Title I rights. If so, then regardless of other claims his Title I cause of action is not preempted by the existence of

11

Title IV claims."[6]  Id. (citation and internal quotation marks omitted).

Plaintiffs argue that they were discriminated against in the exercise of their Title I rights, when Defendants created and enforced the "Ad Hoc Employer Interference Rule," interpreting § 481(g) so broadly that it encompassed speech and assembly rights clearly protected by Title I.  See, e.g., Preliminary Injunction Motion at 1; Mem. in Opp. to Motion to Dismiss at 2.  Specifically, they argue that: § 481(g) does not cover Yuh's purported interference since it did not involve either direct or indirect expenditures; and the evidence Defendants have put forth (and upon which the Dias Report and Mowrey Decision relied) is in dispute.  The Court agrees that there are genuine issues of material fact as to whether Defendants' interpretation of § 481(g) was pretextual and unreasonable, such that it could chill union members' Title I rights.

First, there is a dispute of fact as to whether, in reaching their conclusions, the Dias Report and the Mowrey Decision relied on non-monetary acts, which are not prohibited by Title IV.  The Mowrey Declaration shows that Mowry relied on the

---

[6] The Court notes that the out-of-circuit cases that Defendants cite to the contrary, [Reply at 5-7,] have not been endorsed by the Ninth Circuit and do not persuade the Court to abandon the approach described in Kupau.

12

Dias Report in deciding to void the June Election. [7/10/14 Mowrey Ltr. to Akamu; Mowrey Decl. at ¶¶ 9-11.] In his report, Dias wrote that the DOL, Office of Labor Management Standards ("the Standards"), "strictly prohibit[] the use of employer funds or **employer support** on behalf of any candidate." [Dias Report at pg. 312 (emphasis added).] However, the Standards, which Dias attaches to his declaration, do not go so far as to prohibit employer support. The section of the Standards titled "Union and Employer Funds" states, *inter alia*:

> •A union or employer may not contribute money or anything of value (such as the use of facilities, equipment, or supplies) to promote the candidacy of any individual in a union officer election.
>
> . . . .
>
> •Any expenditure of union or employer funds on behalf of a candidate, even if the amount is small, is a violation of federal law.
>
> •The use of union/employer funds or facilities is a violation of federal law even if union officials or the employer do not know about or approve of the use.
>
> •The prohibition against the use of union and employer funds applies to direct expenditures from the union or employer as well as indirect expenditures including:
>
> ▸ campaigning on time paid for by the union or employer
>
> ▸ use of union/employer owned or leased equipment such as telephones, fax machines and copy machines
>
> ▸ use of union/employer supplies such as stamps, paper, and envelopes

13

>                   ▸      use of union/employer property or
>                          facilities
>
> . . . .

[Dias Report, Exh. 6 (Standards) at pg. 373.]  Taken together,

the Standards prohibit the use of an employer's money or

something of monetary value, not simply "employer support."

The Standards are consistent with the case law.  The

most expansive reading of § 481(g) that the Court is aware of

limits § 481(g) to money or things of value as well.[7]  For

example, in <u>Donovan v. Local Union 70, International Brotherhood

of Teamsters, Chauffeurs, Warehousemen, & Helpers of America</u>, 661

F.2d 1199, 1202 (9th Cir. 1981), the Ninth Circuit upheld a

decision finding that, when union members borrowed an employer's

trailer and used it to post election signs, they violated

§ 481(g).  <u>See also</u> <u>Solis v. Local 9477</u>, 798 F. Supp. 2d 701, 705

(D. Md. 2011) ("Accordingly, the Court holds that use of an

employer's email system to promote a candidate in a union

---

[7] The support that Defendants cite is not to the contrary.
[Mem. in Supp. of Motion to Dismiss at 24-26.]  The cases from
other circuits and administrative decisions from the 1960s,
1970s, and early 1980s, as summarized in the DOL publications,
[<u>id.</u> at 24-26,] show that an employer may not use his position as
an employer **of union members** to exert pressure on those members
to vote for a particular candidate, nor use indirect expenditures
to assist in campaigning.  None of these acts are at issue.  The
sole issue implicated in this case is the mailing of campaign
literature, which is disputed, and discussed, *supra*.

14

election constitutes a violation of the LMRDA.").

Another Ninth Circuit opinion shows that the limits on contributions of unions and employers focus on whether money was spent to support a candidate:

> The agreed facts fully justify the district court's finding of a union violation of Section 401(g) with respect to the election for the office of president. They disclose that the International donated materials, secretarial help and the use of its facilities to print advertising leaflets for Kenneth Rose, the Local's incumbent president, which Rose used in conducting his successful campaign for reelection.
>
> The expense was undoubtedly 'minimal,' as appellees argue, but it nevertheless reflected the outlay of a sensible sum of union money. Indeed the International, shortly after the Secretary began his investigation and made known his interest in the matter, presented Rose a bill for $13.04, which he immediately paid.
>
> The legislative history of the Act does not indicate that Congress intended to place a limit on the amount that a union might lawfully spend to aid a candidate for office or that it meant to encourage troublesome factual disputes over how much (or little) money constitutes a 'de minimis' amount; and the language of the provision itself is clear and unambiguous. It provides in terms that 'no moneys' of a union shall be spent to promote the candidacy of any person for union office.

<u>Shultz v. Local Union 6799, United Steelworkers of America</u>, 426 F.2d 969, 972 (9th Cir. 1970). These cases reinforce the plain language of § 481(g) and its implementing regulations, and are consistent with the Standards, that direct and indirect employer

15

expenditures are prohibited, but not employer support.  Since there is a genuine dispute of fact as to whether the Dias Report and Mowrey Decision relied on this clearly mistaken interpretation, summary judgment is not warranted at present.[8]

Second, there are issues in dispute as to Yuh's purported interference that provide the basis for the Dias Report (and, in turn, the Mowrey Decision).  In his report, Dias analyzes the evidence he includes as exhibits, and then concludes, "[Yuh] did actively campaign against candidates Damien Kim and Peter Akamu and for candidates Craig Inagaki and Harry Ono by, mailing out anonymous campaign material, hand-distributing campaign fliers, speaking to union member work groups and soliciting support from individual union members in direct violation of the LMRDA."  [Dias Report at pg. 314.]  As discussed *supra*, the only one of these acts conceivably prohibited by § 481(g) is the mailing out of campaign fliers, since it implicates expenditures, i.e., funds for stamps, photocopies, and/or mailing materials like paper and envelopes.

---

[8] Plaintiffs also provide, in the Declaration of Gerald Yuh ("Yuh Declaration"), evidence that Dias may have harbored a grudge against Yuh, and thus have had a motive to interpret § 481(g) overbroadly.  [Mem. in Opp. to Motion to Dismiss, Yuh Decl. at ¶¶ 29-35 (Yuh's refusing to exert undue influence regarding scholarship program for Dias); id., Decl. of Celeste Kuuipo Lacuesta (attesting that Dias confided in her that he was working to remove Yuh from union leadership).]  While this evidence does not prove pretext, it further supports Plaintiffs' Title I theory of discriminatory enforcement of § 481(g).

However, Plaintiffs have offered evidence to dispute all of the evidence of interference, including the mailing.

The Exhibits to the Dias Report include:

- a June 24, 2014 email from union member Dean Kauhu, recounting an incident from April 2014, in which Yuh approached him with Inagaki while at a restaurant and encouraged him to vote for the Reform Slate; [id., Exh. 7 at pg. 396;]

- Dias's notes regarding a conversation with union member Jared Ishiki regarding a meeting in February or March 2014 run by Yuh about problems with the current Local 1186 administration; [id. at pg. 398;]

- union member Herman Carpio's unsworn declaration stating that Yuh privately gave him campaign materials and asked Carpio to distribute them; [id. at pg. 383;] and

- photocopies of anonymous mailers sent to union members, criticizing the current local administration, including one to Robert T. Aquino that has a return address, which Dias states is Yuh's [id., Exh. 8 at pgs. 400-35].[9]

This is the sum and substance of the documentary support for the Dias Report's recommendation to void the June Election.[10]

---

[9] Dias also concludes that these mailers came directly from Yuh because: they are similar to those used by Yuh in his own campaign in 2011; [Dias Report, Exh. 9 at pgs. 437-53;] and Yuh may have had access to the union mailing list from his time as a union officer, [id. at pgs. 313-14,] which Yuh denies.

[10] Dias also offers extremely truncated excerpts from purported audio recordings of: a thirty-minute talk that Yuh gave to union members in October 2013 denouncing the union leadership; and testimony Yuh gave before the Honolulu City Council opposing reappointment of Kim to the Honolulu Rail Transit Board. [Dias Report, Exh. 7 at pgs. 379-82.] Beyond the fact that they are directly disputed by the Yuh Declaration, since these exhibits are incomplete and not authenticated, the Court gives them little weight. Finally, he also offer notes of conversations with Yuh and Inagaki, but the Yuh and Inagaki declarations (attached to the memorandum in opposition to the Motion to Dismiss) dispute the substance of these.

On the other hand, Plaintiffs offer the following sworn evidence to rebut the purported acts of interference:

- the declaration of Kaohu, stating that his email relating to the April 2014 incident at the restaurant was taken out of context and Yuh was not campaigning; [Mem. in Opp. to Motion to Dismiss, Decl. of Dean Kaohu;]

- the declaration of Yuh's friend and former colleague, Blane Mitsunami, attesting that union members regularly approach Yuh for advice regarding the union, and not the other way around, and that he organized and ran the meeting that Ishiki attended, not Yuh; [id., Decl. of Blane Mitsunami at ¶¶ 5-10;] and

- the declaration of Gerald Yuh, stating that: he is regularly approached by union members who engage him in conversations about the union and its administration; [id., Yuh Decl. at ¶¶ 23, 39;] Carpio called Yuh to tell him he was pressured to make the statement in the Dias Report against Yuh, and that Yuh had never given Carpio the campaign materials to hand out; [id. at ¶¶ 47, 49-51;] and Yuh did not have access to the mailing list, did not send out any of the mailers and, in fact, he himself received one with a personalized note to him [id. at ¶¶ 63-70; id., Exh. 15 (mailer with note)].

While Plaintiffs' evidence does not affirmatively prove that Yuh did not engage in the campaigning that Dias reports, it is sufficient to create a genuine issue of material fact as to these matters. Taken in the light most favorable to Plaintiffs, genuine issues of fact remain as to whether the Mowrey Decision to void the June Election was based on a clearly erroneous and pretextual analysis of § 481(g), and whether the Dias Report had a sound factual basis. See Safe Air, 373 F.3d at 1040 n.4.

The Court FINDS that Plaintiffs' claims are not preempted by Title IV to the extent that they allege that

Mowrey's decision to void the election results relied on findings of non-monetary employer support, and thereby chill Plaintiffs' Title I rights.  The Court thus DENIES the Motion to Dismiss as to Plaintiffs' Title I claims because genuine issues remain as to whether Mowrey used Yuh's non-financial support as a basis for his decision, that determination disadvantaged Plaintiffs, and Plaintiffs can prove non-hypothetical damages.  See Safe Air, 373 F.3d at 1040; Kupau, 622 F.2d at 455.  The Court GRANTS the Motion to Dismiss for lack of subject matter jurisdiction as to all other matters as being preempted by Title IV.

## CONCLUSION

On the basis of the foregoing, Plaintiffs' Motion for a Preliminary Injunction, filed July 21, 2014, is HEREBY DENIED as moot; and IBEW and Dias's Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed August 6, 2014, is HEREBY GRANTED IN PART AND DENIED IN PART.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, September 30, 2014.



　　　　　　　　　　　　　　　/s/ Leslie E. Kobayashi
　　　　　　　　　　　　　　Leslie E. Kobayashi
　　　　　　　　　　　　　　United States District Judge




**HARRY ONO, ET AL. VS. HAROLD DIAS, JR., ET AL; CIVIL 14-00237 LEK-KSC; ORDER DENYING AS MOOT PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION; AND GRANTING IN PART AND DENYING IN PART DEFENDANTS INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS AND HAROLD DIAS, JR.'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**